UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

SOUTHERN FOREST WATCH, INC., *et al.*,      )
                                             )
                    Plaintiffs,              )
                                             )    No.    3:13-CV-116
v.                                           )           Phillips/Guyton
                                             )
SECRETARY OF THE INTERIOR,                   )
SALLY JEWELL, *et al.*,                      )
                                             )
                    Defendants.              )

## MEMORANDUM OPINION

On February 22, 2012, the National Park Service ("NPS") approved a $4.00 per-person, per-night backcountry camping fee ("BCF") for all backcountry campsites and shelters in the Great Smoky Mountains National Park ("GRSM" or the "Park"). Southern Forest Watch, Inc., and individual plaintiffs brought this declaratory judgment action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, to challenge the establishment of the BCF. Plaintiffs allege that the BCF violates the Federal Lands Recreation Enhancement Act ("FLREA"), 16 U.S.C. § 6801, *et seq.*, and the NPS Organic Act, 54 U.S.C.A. § 100101, *et seq.*, and that the process and decision to implement the BCF was arbitrary and capricious. Plaintiffs also complain of unrelated NPS decisions to re-route the Ace Gap Trail off private land and the alleged granting of permission to a private resort to maintain and utilize their own network of trails on Park property for the exclusive use of the resort.

The parties have filed cross motions for summary judgment[1] with supporting briefs and affidavits [Docs. 44, 45, 48, 64, 65, 66, 67, 68, 72, 76, 84, 88] based on the administrative record. Having carefully considered the parties' briefs in light of the entire record, the Court will **DENY** the plaintiffs' motion [Doc. 44] and **GRANT** the defendants' motion [Doc. 64].

## I.    Request for Discovery

Plaintiffs' motion requests that the Court "[a]llow discovery to proceed" [Doc. 44 at ¶ 6]. Plaintiffs argue that the administrative record is incomplete, records are missing, and "persistent problems were swept under the rug" [Doc. 48 at p. 27]. Plaintiffs request that the Court order discovery on all matters or alternatively vacate the decision to implement the BCF and remand the proceedings for proper administrative adjudication and allowing Freedom of Information Act searches [*Id.*].

Defendants argue that the APA permits judicial review only of a "final agency action," 5 U.S.C. § 704, based on the administrative record of the materials compiled by the agency that were before it at the time it made the decision at issue. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Defendants also rely on the presumption that the agency properly compiled the administrative record absent clear evidence to the contrary. *See Bullwinkel*

---

[1]Plaintiffs' motion [Doc. 44] is styled as a "motion to vacate" by which the plaintiffs request the Court to "vacate" the defendants' decision to implement the BCF and to declare certain actions as illegal. As defendants note in their brief [Doc. 72 at p. 3, n.2], there is no provision for a "motion to vacate" under the Federal Rules of Civil Procedure and defendants have responded as if the motion were filed as a motion for summary judgment under Rule 56, a point to which the plaintiffs concede [Doc. 76 at p. 16]. Accordingly, the Court will treat and consider both motions as motions for summary judgment pursuant to Fed. R. Civ. P. 56.

*v. U.S. Dep't of Energy*, No. 11-1082, 2013 WL 384902, at *1 (W.D. Tenn. Jan. 16, 2013); *California v. U.S. Dep't of Labor*, No. 2:13-cv-02069, 2014 WL 1665290, at *4—5 (E.D. Cal. Apr. 24, 2014). Defendants contend that supplementation of the administrative record is appropriate only when (1) an agency deliberately or negligently excludes documents or (2) the reviewing court needs background documents to determine whether the agency considered all relevant factors. *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (quoting *James Madison Ltd. By Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996)). Defendants contend that the plaintiffs have not made the strong showing of bad faith required to permit discovery [Doc. 72 at pp. 65—67].

In response [Doc. 76], plaintiffs point to Fed. R. Civ. P. 56(d)(2) that they cannot present facts essential to justify their opposition to the defendants' motion and therefore they should be allowed to take discovery. Plaintiffs' counsel has submitted an affidavit in which he references the following types of information relied on by the defendants but which does not appear in the administrative record: "verbal complaints" about the backcountry reservation system; the absence of published statistics reflecting backcountry campsite usage; the absence of certain email replies; media interview requests; documentation of verbal comments from political officials; notices of the BCF and civic engagement guidelines published in the Federal Register; any contacts to local chambers of commerce; and references to unidentified "partners, concessioners, and incidental business permittees" who support the BCF [Doc. 76-3 at ¶¶ 4—12].

Defendants reply by arguing that the Court should focus on whether the record is sufficient for purposes of judicial review under the APA [Doc. 84 at pp. 22—27].

Pointing to the volume and type of documents contained in the administrative record, defendants contend that additional documents would make no difference if the record as it exists is adequate to explain the NPS's decision and that the NPS is not required to include in the administrative record every piece of paper "peripherally related but not material" to the BCF decision [*Id.* at p. 22]. Defendants point out that some of what plaintiffs seek, *e.g.*, documentation of verbal complaints and comments, media interviews, or notes of phone conversations, may not exist or are not required to be included in the administrative record. Similarly, defendants argue that post-decisional information, such as statistics regarding backcountry campsites or notes of meetings which occurred after implementation of the BCF would not be relevant; they were not considered by the NPS at the time of its decision and thus should not be part of the administrative record.

As the defendants correctly point out, the standard of review for an APA case is whether the agency decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" 5 U.S.C. § 706(2)(A). Thus, the Court's focus is on "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142. Supplementation of the administrative record may be appropriate when an agency deliberately or negligently excludes certain documents, or when the court needs certain "background information" in order to determine whether the agency considered all of the relevant factors. *Sierra Club*, 120 F.3d at 638. In order to justify the "exceptional circumstances" to supplement the administrative record, *Charter Twp. of Van Buren v. Adamkus*, No. 98-1463, 1999 WL

4

701924, at *4 (6th Cir. Aug. 30, 1999), a plaintiff must make a "'strong showing' of bad faith." *Sierra Club*, 120 F.3d at 638. Further, reviewing courts have been cautioned "not to allow such evidence to change the character of the hearing from one of review to a trial de novo." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1428 (6th Cir. 1991) (quoting *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984)).

Upon careful review of plaintiffs' request, the Court concludes that they have not made a strong showing of bad faith or exceptional circumstances to justify supplementation of the record. Some of the allegedly missing information is after-the-fact data, such as backcountry statistics after the BCF was implemented, pre-suit correspondence from the plaintiffs, and information as to why certain Park employees are no longer at GRSM [Doc. 48 at pp. 19—20]. Information that was not part of the agency's decision-making process *at the time* is not relevant to whether that decision was arbitrary and capricious and should not be included in the administrative record. *Camp*, 411 U.S. at 142.

Moreover, much of the information plaintiffs are seeking is hypothetical and may not exist. *See California*, 2014 WL 1665290, at *4—5 (plaintiffs cannot "merely proffer[] broad categories of documents and data that are 'likely' to exist as a result of other documents that are included in the administrative record") (quoting *City of Duluth v. Jewell*, No. 12-cv-1116, 2013 WL 5422453, at *5 (D.D.C. Sept. 29, 2013)). For example, plaintiffs seek documentation of the verbal complaints GRSM employees received about the backcountry reservation system or verbal comments from politicians, but there is no evidence that any documentation of such verbal conversations exists.

Thus, if there is no written record of these conversations, they could not be included in the administrative record for consideration by the NPS. *See Seattle Audubon Society v. Lyons*, 871 F. Supp. 1291, 1308—09 (W.D. Wash. 1994), *aff'd*, 80 F.3d 1401 (9th Cir. 1996) ("Personal files and notes are not required to be contained in an administrative record."). Similarly, if there are no documents evidencing media interview requests or contacts to local chambers of commerce, there is nothing with which to supplement the administrative record. Further, plaintiffs have presented no evidence of bad faith or that the agency has deliberately or negligently withheld documents from the record. The request for discovery is denied.

## II.    Relevant Facts

### A.    Adoption of the BCF

The NPS was created by Congress in 1916 as part of the Department of the Interior, with its purpose "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C.A. § 100101 (2014).[2]

The Great Smoky Mountains National Park is comprised of approximately half of a million acres of public park lands in North Carolina and Tennessee. GRSM includes over 800 miles of maintained hiking trails and approximately 100 backcountry campsites

---

[2]The Organic Act, as cited in the parties' briefs, has recently been repealed and re-codified with other NPS-related laws in Title 54, United States Code. PL 113-287, 128 Stat. 3094 (Dec. 19, 2014).

and shelters maintained by the NPS [AR 132].[3]  The Park also contains hundreds of miles of unmarked trails, referred to as "manways," that are not currently maintained by the NPS [Doc. 67, Looney Dec. at ¶ 5].[4]  Prior to 2013, permits for use of the backcountry sites and shelters were available free of charge.  Reservations could be made by telephone to the Park's backcountry office or in person at the Backcountry Information office in the Sugarlands Visitors Center [AR 132].

The record reflects that beginning at least in 2009 and continuing through 2011, the NPS received complaints from backcountry campers about difficulties in making backcountry camping reservations [AR 8—14].  These campers generally indicated that they had been unsuccessful in getting through the phone reservation system because of busy signals or an automated response that no one could take the call [*Id.*].  The record contains copies of some emails from visitors who had difficulty making reservations [AR 8—14], as well as anecdotal evidence from Park staff [*e.g.*, AR 100, 106, 116].  NPS staff also received complaints about backcountry campers who were not following Park rules, such as using backcountry campsites without a permit, bringing dogs into the backcountry, and trash left at campsites [AR 18—21].[5]  The record also reflects that in

---

[3]The administrative record is filed as Document 39 in the court record.  Pages in the administrative record will be cited as "AR___."

[4]The defendants filed several declarations of current and former NPS personnel in support of their motion for summary judgment [Docs. 65, 66, 67, 68].  For ease of reference, the Court will cite to those documents by the last name of the declarant, such as "Looney Dec. at ___."

[5]Plaintiffs cite statistical evidence that GRSM issued an average of 13,000 backcountry permits per year for the period of 2006 – 2010 for a total of 33,000 campers per year and an average of 2-3 people per campsite [Doc. 48 at p. 3; AR 40].  Plaintiffs contend this shows that campsites were not crowded.  Plaintiffs also cite to public comments in the record which state they have not experienced overcrowding or trash at campsites [Doc. 48 at p. 4].  Nevertheless, there is some evidence in the record that some Park visitors experienced overcrowded campsites, trash at

7

2010, NPS was notified that the software program it used for making backcountry reservations, Wilderness Trakker, was out of date and would likely not continue to function on updated operating systems [AR 15]. In July 2010, NPS began to consider options to replace the Wilderness Trakker system for handling backcountry reservations [AR 15—17].

In January 2011, a Backcountry Planning and Reservation Task Group met to consider long-term backcountry trip planning and reservations services and ways to increase the NPS's level of customer service [AR 22—26]. The group agreed that an ideal alternative to the status quo would include: an online reservation and permit system; an NPS staffed backcountry office; NPS staff at the Cades Cove Ranger Station and the Oconoluftee Visitor Center who could handle walk-in backcountry trip planning, education, and reservations; a mandatory education process before a backcountry permit would be issued; walk-up reservation terminals at the Park's visitor centers; and an automated system to notify backcountry campers of emergency conditions and closures [AR 22—24]. The group discussed projected costs and sources of funding for the proposed alternative system [AR 24—25]. Finally, the group considered other topics related to backcountry management, including the need for more commissioned rangers in the backcountry and the impact of horses in the backcountry [AR 25—26].

On March 25, 2011, GRSM sought permission from the Fee and Special Park Use Program Manager of NPS's Southeast Regional office ("SER") to proceed with civic

---

campsites, or observed other rule violations and that some of those concerns were voiced to the NPS. The fact that these were not uniform experiences by backcountry visitors does not create a disputed issue of material fact.

engagement to explore the option of a backcountry permit fee to cover the cost of an online permit reservation system with the National Recreation Reservation Service ("NRRS" or "Recreation.gov") [AR 28]. On May 31, 2011, GRSM's request was forwarded to the NPS Washington Support Office ("WASO") for final approval of civic engagement [AR 31—36]. The memo sent to WASO describes GRSM's request as follows:

> GRSM is proposing to institute a new fee for backcountry camping and shelter reservation and use. The park currently does not charge for these reservations and is proposing to begin charging a fee to cover the service charges and related costs of putting these sites onto the NRRS. The final actual fee will be determined through the civic engagement process and is likely to align with the total fees charged to the NPS by the NRRS. Having these sites on the NRRS will improve customer service for the visitors wishing to reserve these sites as they will now have 24/7 access to reserve and/or change reservations rather than having to call the park during normal business hours. There will be no increase in overall annual revenue as the result of this proposed increase as this will simply be a new fee to cover the recreation.gov service fees.

[AR 34.] Following completion of the civic engagement process, GRSM was instructed to submit a completed implementation plan to the NPS regional office and WASO for review and approval [AR 35].

The record reflects that, while waiting for WASO approval to begin the civic engagement process, GRSM staff began comparing the permit and/or reservation fees charged at other national parks, the projected revenue from various fee structures, and the cost of different backcountry staffing scenarios [AR 37—39]. GRSM staff also began to develop a list of questions and issues for implementation of a reservation/permit system [AR 41—43]. Staff considered issues such as: how to issue permits to "thru hikers" traversing the Appalachian Trail, the Benton MacKaye Trail, and the Mountains to Sea

9

Trail; how to handle permits for commercial use authorization holders; the implications of having some versus all backcountry sites in the reservation system; how to handle cancellations due to bear activity or other closures; and how to handle reservations/permits for volunteers doing work in the backcountry [*Id.*].

Beginning in June 2011, Park staff developed a draft proposal for restructuring the backcountry office and permit system [AR 45—47]. The proposal went through several iterations before it was presented to the public [AR 58—60 (July 2011), 65—67 (July 15, 2011), 130—131 (July 27, 2011)]. The June 2011 proposal identified the following objectives: increase customer service and improve access to high-quality trip planning information so that visitors may acquire backcountry reservations and permits quickly and easily; avoid crisis management with the impending failure of the current reservation software system; and plan for the long-term sustainability of the backcountry information office [AR 45]. The proposed solutions included: adopt Recreation.gov as an online reservation system for backcountry reservations and permits; combine the reservation system and permit system into one; require reservations for all backcountry sites; and implement a fee structure that would generate revenue to support NPS staffing in the backcountry office [AR 45-46]. The proposal also explored staffing scenarios for the backcountry office, including adding one seasonal law enforcement ranger, and various revenue alternatives based on flat per-reservation fees, flat per-person fees, per-reservation/per-person fees, or per-person/per-night fees [AR 46].

On June 30, 2011, GRSM was advised that its request to proceed with civic engagement on the proposed fees was approved [AR 48], and formal approval was issued

10

on August 26, 2011 [AR 139—145]. The Park was provided with NPS guidelines on civic engagement requirements (known as "Appendix L") and reminded that "they must complete a thorough process of civic engagement and submit the implementation plan for regional and WASO approval prior to moving forward with the proposed new fees" [AR 48]. Further, GRSM was advised that any new fees could not be implemented prior to 2012 and only after receiving approval [*Id*.].

GRSM staff then began to develop a draft plan for civic engagement on the proposed online reservation system and fees [AR 55—57]. This plan identified key messages to stakeholders and a list of public contacts, including Congressional delegations, federal, state, and local officials, local chambers of commerce, commercial use holders, Park partners and other groups [AR 56—57]. The plan also acknowledged the Park's need to "[a]ctively and meaningfully listen to the voices of all interested parties" [AR 55]. The record reflects that Park staff began contacting Park partners (such as the Appalachian Trail Conservancy, Smoky Mountain Trail Riders, Benton MacKaye Trail Association, etc.) by phone and email in late June and early July 2011 to discuss the proposal [AR 61].

On July 19, 2011, the July 15, 2011 draft proposal was sent to GRSM employees for their feedback on the BCF and reservation process [AR 62—67]. The July 15 proposal identifies the same objectives as the initial June proposal with two additional objectives: increase the Park's ability to reliably inform backcountry users of closures, safety issues, and other important backcountry information; and increase NPS presence in the backcountry to monitor recreational use [AR 65]. The record contains copies of

11

email responses from employees and they are largely in favor of the proposal, including the imposition of fees [AR 68—125]. The record also contains feedback from some of the Park's commercial use holders [AR 126—127].

On July 29, 2011, the Park issued the first press release to the public on the BCF and online reservation proposal [AR 132—133] and the July 27, 2011 version of the proposal was posted on the Park website, released to the press, and sent out in mailings [AR 130—131]. Notably, although the format of the July 27 BCF proposal is somewhat different from prior versions, it contains in substance an identification of the same issues and proposed solutions. The July 27 proposal includes using BCF fees to support additional Park rangers in the backcountry [*Id*.]. The news release stated that public input could be provided in writing, by email, and at two informational open houses on August 16 and 18, 2011 [AR 131, 133]. The comment period would last until August 26, 2011 [*Id*.]. A second news release on August 8, 2011 reiterated the dates and times of the open houses [AR 134].

The first open house was held at the Oconaluftee Visitor Center in Cherokee, North Carolina, on August 16, 2011. The attendance log reflects that at least 30 people attended [AR 135—136]. The second open house was held at Park headquarters in Gatlinburg, Tennessee, on August 18, 2011, with at least 40 people attending [AR 137]. Park staff were available during both public meetings to answer questions and provide information about the proposal [AR 134]. The Park received 230 written comments [AR 263—696] on the proposal, much of it negative, and Park staff created a summary of the feedback [AR 138, 146—149]. The staff summary included positive and negative

12

comments on the proposed reservation system, the implementation of backcountry fees and the proposed fee structures, issues related to backcountry management, and misperceptions [*Id*.]. GRSM staff created a summary of the civic engagement process, the feedback received from government officials, stakeholder organizations, and the general public, and GRSM management's position on the proposal [AR 243—44].

On November 8, 2011, the Park submitted a BCF and permit restructuring proposal to the SER office [AR 159—168]. The proposal identified a $4 per-person, per-night fee for backcountry campsites and shelters "to recover the direct costs for providing a reservation system with both internet and phone-in reservation capability, increased public access to trip planning assistance and permit compliance monitoring" [AR 240]. The proposal included a comparability study of fees charged at other NPS sites with similar backcountry characteristics and a list of the other amenity fees charged at GRSM [AR 240, 242]. The proposal also included the summary of the civic engagement process described above [AR 243-244]. The record also reflects that the NPS continued discussions about the BCF with interested groups after submission of the BCF proposal [AR 169, 181, 196, 228, 247—250].

The NPS Regional Director approved the proposal on November 22, 2011, and forwarded it to WASO for final approval [AR 171—172]. The record reflects that NPS WASO staff did consider and debate GRSM's proposal, including the amount of negative feedback received from the public [AR 205—214, 217—222, 229—230, 232—36, 245—246]. On February 22, 2012, WASO approved the BCF and online reservation system [AR 256—257] with official confirmation received by GRSM on March 12, 2012 [AR

13

261—262]. Via a press release on March 7, 2012, NPS announced the implementation of the BCF to begin in 2013 [AR 258—259].

B.     Relocation of the Ace Gap Trail

Plaintiffs allege that the Park granted "exclusive and lucrative license and rights … to political elites," "illegally" rerouted the Ace Gap Trial off of a tract of private land purchased by a "former politician," and  closed two campsites that were too close to the "former politician's property" [Doc. 24 at ¶¶ 67, 69, 91—92]. The "former politician" or "political elite" apparently refers to former Tennessee Governor Don Sundquist, a point that plaintiffs have not contested. The facts relating to the issue of the relocation of the Ace Gap Trail are not contained in the administrative record, but rather are found in the declarations of Clayton F. Jordan, Acting Park Superintendent, and Robert W. Wightman, a retired Staff Park Ranger who was the Park's technical specialist on lands and boundary issues [Docs. 65, 68].

According to Mr. Jordan, the files at GRSM headquarters reveal that a GRSM trail crew rerouted the Ace Gap Trail off of Mr. Sundquist's property, which borders Park property, following completion of the National Environmental Policy Act ("NEPA") compliance process in 2001 [Jordan Dec. at ¶ 7(a)]. Mr. Sundquist requested that the portion of the Ace Gap Trial that was located on his property be moved because he intended to build on his property [Jordan Dec. at ¶ 7(b); Wightman Dec. at ¶ 5]. In March 2000, Mr. Wightman visited the portion of the Ace Gap Trail that Mr. Sundquist thought crossed onto his property [Wightman Dec. at ¶ 6]. Mr. Wightman found that a short section of the trail in that area, approximately 500 feet in length, was outside the

14

Park's boundary as indicated by the Park's boundary signs [*Id.*]. Park management decided to relocate the segment of the trail from Mr. Sundquist's property far enough away from the Park boundary so it would clearly and definitively be located on Park land [Wightman Dec. at ¶ 7].

The Park subsequently commissioned a private land surveyor to conduct an independent analysis of relevant public and private deeds and surveys [Wightman Dec. at ¶ 8]. The private land surveyor's report provided additional corroboration that a portion of the Ace Gap Trail was on Mr. Sundquist's property [*Id.*]. A certified land surveyor in NPS's Regional Office later reviewed the private land surveyor's report and made a definitive conclusion about the location of the boundary, concluding that the Ace Gap Trail crossed over onto Mr. Sundquist's property [*Id.*]. Following completion of a NEPA-required compliance process, an approximately 1500-foot section of the trail was relocated by the Park's trail crew in 2001 [Wightman Dec. at ¶ 10].

Mr. Wightman states that, although occurring infrequently, it has been the practice of the Park to voluntarily relocate sections of a trail from private land to Park land when a landowner requests such action and when there is reasonable evidence that the trail is indeed on private land [Wightman Dec. at ¶ 9]. Mr. Wightman states that this practice is based on a respect for private property and a landowner's legitimate concerns about trespass, privacy, liability, and potential vandalism [*Id.*]. Further, Mr. Wightman opines that relocation away from the Park boundary also helps to protect the wilderness nature of a trail for a better visitor experience [*Id.*].

15

There is no NPS/GRSM record that Mr. Sundquist ever applied for or was granted a license to property inside the Park [Jordan Dec. at ¶ 6]. Mr. Jordan found no record or documentation to indicate that NPS or GRSM ever made any sort of claim of title through any legal process or procedure to the land outside the Park boundary with respect to the portion of the Ace Gap Trail located on Mr. Sundquist's property [Jordan Dec. at ¶ 8]. Trail maintenance and routing, including trail reroutings and closings, are considered to be among the managerial responsibilities of the Park superintendent [Jordan Dec. at ¶ 10].

C.     Trail Maintenance Near Blackberry Farm

Plaintiffs allege that a "local, private resort" has received permission from defendants to "maintain and utilize their own separate, exclusive network of trails into, on and within the [Park]… to the exclusion of everyone else" [Doc. 24 at ¶ 70]. Plaintiffs claim that Blackberry Farm "has erected their own trail signs" within the Park's borders and these signs include boxes with the resort's own trail maps [*Id.* at ¶ 71]. Plaintiffs suggest that Beard Cane Trail leads up to and intersects with this private trail system, but that defendants closed the Beard Cane Trail several years ago due to storm damage and have not reopened it [*Id.* at ¶ 72]. Thus, plaintiffs contend that this portion of the Park remains closed to the public, except for customers and residents of the private resort [*Id.*]. Plaintiffs further allege that in 2009 riders on four wheelers were driving on Cane Creek Trail within the borders of the Park using chain saws to widen trails and these riders claimed to be from Blackberry Farm [*Id.* at ¶ 74]. As with the claim regarding the Ace Gap Trail, the facts related to the Blackberry Farm claim are not contained in the

16

administrative record, but come from the declarations of Kent F. Looney and Mark S. Eckert, both of whom are Park rangers [Docs. 66, 67].

On December 15, 2007, Mr. Looney patrolled the section of the Park with a common boundary to Blackberry Farm and discovered two signs, one near the junction of the Ace Gap Trail and the Beard Cane Trail and one along the Beard Cane Trail, which warned that persons "are leaving Blackberry Farm property and entering Great Smoky Mtns National Park. Trails are not marked or maintained." [Looney Dec. at ¶ 4]. Mr. Looney decided to follow up with Blackberry Farm management to have the signs removed from Park property [*Id.*].

On November 20, 2009, Mr. Looney patrolled another section of the Park that shares a boundary with Blackberry Farm and observed that a section of the old Boundary Trail adjacent to Blackberry Farm property had been cleared of dead and downed trees for easier passage and that trees were marked with painted blazes to designate the route [Looney Dec. at ¶ 5]. The Boundary Trail had once been maintained by NPS, but it had become an abandoned "manway," meaning that while many hikers continued to use it and are permitted to do so, the NPS no longer maintains it [*Id.*]. Part of the trail lies on Blackberry Farm property and part of it lies within the Park boundary [*Id.*]. According to Mr. Looney, maintenance of the Boundary Trail within the Park would not have been authorized [*Id.*]. During this patrol, Mr. Looney also discovered two privately installed wooden signposts along the boundary line where the old Boundary Trail connects with the privately maintained trails on Blackberry Farm property [*Id.* at ¶ 6]. One of these signposts was on Park property and set in concrete [*Id.*].

Mr. Looney considered these issues significant enough that he reported the conditions to his immediate supervisor [*Id*. at ¶ 7]. Because there was little resource damage and no negative impact to visitors, the decision was made to address the matter through contact with Blackberry Farm management [*Id*.]. Mr. Looney believes that he contacted Blackberry Farm staff by phone to discuss the unauthorized activity and obtained a cooperative response, or else he would have felt greater law enforcement action was required [*Id*.]. Mr. Looney felt that the issue was a simple compliance matter within his authority to apply his discretion and did not feel the need to involve any Park managers beyond his direct supervisor [*Id*.].

Mr. Looney was assigned to return to this section of the boundary with Mr. Eckert on September 6, 2012, to investigate allegations of possible encroachment activity [*Id*. at ¶ 8]. This area, Blair Gap, is a crossroads of four separate paths: the Ace Gap Trail, the Beard Cane Trail, the old Boundary Trail manway, and a manway that leaves the Park out of Blair Gap which is part of the Blackberry Farm Blair Gap Trail [Eckert Dec. at ¶ 3]. During this visit, Mr. Looney observed that the two signs he had observed during the 2007 patrol had been relocated off of Park property and onto Blackberry Farm property [Looney Dec. at ¶ 8]. He also observed that there appeared to be no recent effort to clear the manway of blowdowns as he had observed in 2009 [*Id*.]. The two trail junction signposts he had observed earlier were still present; one appeared to be mounted at a trail junction outside the Park boundary and one was believed to be mounted within the Park boundary [*Id*.]. The painted trail blazes on the trees along the manway were still present, but did not appear to have been repainted and were slowly fading with time [*Id*.].

West of Blair Gap, Mr. Ecerkt observed a signpost with several sign panels attached placed by Blackberry Farm that was located outside the Park boundary [Eckert Dec. at ¶ 5]. Mr. Eckert also observed a large signpost which read "Blair Gap Trail and Boundary Trail" within the Park boundary that had been placed there by Blackberry Farm [*Id*.]. There was another Blackberry Farm signpost outside the Park boundary to which an ammo can was attached, presumably for holding maps [*Id*.]. The signs indicated that purple blazes marked the Blair Gap Trail, red blazes marked the Boundary Trail, and yellow blazes marked the Horse Slide Trail, which is completely outside the Park [*Id*.]. Mr. Eckert observed some red blazes on trees well within the Park boundary, along the western route of the old Boundary Trail manway [*Id*.]. Nothing on the Blackberry Farm signage, within or outside the Park boundary, indicated that any of the trails in that area were for the exclusive use of Blackberry Farm guests only [*Id.*]. Further, neither Mr. Looney nor Mr. Eckert encountered any evidence to suggest illegal ATV usage throughout the patrol [*Id*.].

In April 2011, an EF-4 tornado tore through a sizeable portion of the Cades Cove backcountry, causing thousands of tree blow-downs on the trails and hundreds of sites where uprooted trees caused craters in the trail tread [Looney Dec. at ¶ 10]. As a result, ten trails were closed in totality or in part in the Cades Cove area, including the Beard Cane and the Ace Gap Trails that access the section of the Park in the Blair Gap area [*Id*.]. These trails were closed to the public, including staff and guests of Blackberry Farms [*Id*.]. Trails were reopened as rehabilitation by the Park's trail crew was completed [*Id*.]. By August 2012, the Ace Gap Trail had been repaired and reopened,

19

restoring public trail access to the Blackberry Farms section of the boundary [*Id*.]. In April 2013, the last two trails, including the Beard Cane Trail, had been repaired and reopened [*Id*.]. However, in a July 17, 2014 affidavit, witness Mark Cooke stated that he had recently hiked the Ace Gap Trail to the intersection with Beard Cane Trail and observed a non-NPS sign that states "Blair Gap Trail Closed Beyond This Point" [Doc. 45-6 at ¶ 7].

In April 2014, Mr. Eckert returned to the section of the Park boundary shared with Blackberry Farm [Eckert Dec. at ¶ 6]. Using a GPS unit and digital boundary data acquired from the Park Lands Office, he was able to determine the boundary line between Park land and Blackberry Farm [*Id*.]. Mr. Eckert determined that a two-paneled sign erected by Blackberry Farm was likely inside the Park and he removed it, placing it on Blackberry Farm property [*Id*.]. Mr. Eckert also removed three small metal signs and purple and red paint blazes that had been put up by Blackberry Farm [*Id*.]. Mr. Eckert believes that Park land close to the boundary with Blackberry Farm is now clear of all unauthorized signage and blazes as described [*Id*. at ¶ 7].

Mr. Eckert states that none of the Blackberry Farm signs he saw conveyed a message to passing hikers that any trail in the area was for the exclusive use of Blackberry Farm guests [*Id*.]. Mr. Eckert has never received complaints from hikers that they perceive any part of the Park as being used by Blackberry Farm guests to the exclusion of the public [*Id*.]. Neither Mr. Eckert nor Mr. Looney are aware of any requests by Blackberry Farm for special treatment regarding use of Park trails, nor have

they been informed or asked to act upon any sort of license, special permission or privilege given to Blackberry Farm [*Id.* at ¶ 8; Looney Dec. at ¶ 9].

## III.    <u>Standard of Review</u>

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper

question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Because the FLREA does not supply a separate standard for judicial review, compliance with the FLREA is reviewed under the APA. *Wiechers v. Moore*, No. 1:13-CV-00223-LJO-JLT, 2014 WL 1400843, at *6 (E.D. Cal. Apr. 10, 2014); *Sherer v. U.S. Forest Serv.*, 727 F. Supp. 2d 1080, 1085—87 (D. Colo. 2010), *aff'd*, 653 F.3d 1241 (10th Cir. 2011). Under the APA, a reviewing court will not set aside a final agency action unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although the court's review is to be "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). This standard of review is the "least demanding review of an administrative action," and "requires the party challenging the agency's action to 'show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations.'" *Coalition for Gov't*

22

*Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435, 475 (6th Cir. 2004) (quoting

*McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir. 1987)).  In considering whether

agency action is "arbitrary and capricious," the Court may consider whether:

> the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the evidence
> before the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.  The reviewing court
> should not attempt itself to make up for such deficiencies; [w]e may not
> supply a reasoned basis for the agency's action that the agency itself has
> not given.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The review of a federal agency decision under the APA is a review of the administrative

record and a determination, based on the administrative record, of whether that decision

was arbitrary and capricious.  *Tennessee Clean Water Network v. Norton*, No. 3:05-CV-

214, 2005 WL 2464675, at *8 (E.D. Tenn. Oct. 4, 2005) (Varlan, J.).  This is a deferential

standard of review that presumes the validity of agency actions.  *See Chemical Mfrs.*

*Ass'n v. Nat'l Res. Def. Council, Inc.*, 470 U.S. 116, 131 (1985).


IV.   <u>Analysis</u>

   A.   <u>The FLREA</u>

   Plaintiffs assert several shifting reasons why the BCF is not permitted by the

FLREA.  First, they contend that defendants are precluded from charging any fees

whatsoever inside the Park based on 16 U.S.C. § 6802(d)(3) [Doc. 24 at ¶¶ 95—96

(Count III)].  This subsection of the FLREA provides:

> The Secretary shall not charge an entrance fee or standard amenity recreation fee for the following: … (E) Entrance on other routes into the Great Smoky Mountains National Park or any part thereof unless fees are charged for entrance into that park on main highways and thoroughfares.

16 U.S.C. § 6802(d)(3)(E). Plaintiffs place particular emphasis on the phrase "any part" of the Park and note that because entrance fees are not permitted in the GRSM, the BCF is also prohibited [Doc. 48 at p. 22]. In response, defendants point out that the BCF is an "expanded amenity fee"[6] and not an "entrance fee" or a "standard amenity fee" [Doc. 72 at pp. 28—29]. Rather, NPS relies on subsection 6802(g)(1) which permits the Secretary of the Interior to "charge an *expanded amenity recreation fee* … at Federal recreational lands and waters under the jurisdiction of the National Park Service … when the Secretary of the Interior determines that the visitor uses a specific or specialized facility, equipment, or service." 16 U.S.C. § 6802(g)(1) (emphasis added).

In response to this argument, plaintiffs appear to have dropped their argument as to subsection 6802(d)(3)(E). Instead, plaintiffs go through a subsection-by-subsection comparison of § 6802, whereby they contend that the limitations in subsection 6802(d), which limits recreation fees at lands administered by the Bureau of Land management, the Forest Service, or the Bureau of Reclamation, also apply to NPS. Specifically, plaintiffs rely on subsection 6802(d)(1)(E) which prohibits those agencies (but not NPS) from charging a standard amenity recreation fee or an expanded amenity recreation fee "[f]or camping at undeveloped sites that do not provide a minimum number of facilities

---

[6]The FLREA defines an "expanded amenity recreation fee" as a recreation fee authorized by § 6802(g). 16 U.S.C. § 6801(2).

and services as described in subsection (g)(2)(A)."[7]   16 U.S.C. § 6802(d)(1)(E).

Plaintiffs contend that these limitations apply to the NPS when charging an expanded

amenity recreation fee pursuant to the language of subsection 6802(g)(1) because

subsection 6802(g)(1) opens with the phrase "[e]xcept as limited by subsection (d)" [Doc.

76 at pp. 12—14].   Plaintiffs further point to subsection 6802(g)(2)(A) as evidence of a

"dramatic limit[]" on defendants' authority to charge the BCF [*Id.* at p. 13].

As defendants' correctly note in their reply, this argument ignores the plain

language of the statute [Doc. 84 at pp. 14—16].   Subsection 6802(d)(1) and all of its

subparts plainly apply to "Federal recreational lands and waters administered by the

Bureau of Land Management, the Forest Service, or the Bureau of Reclamation"; it does

not include the NPS.   Similarly, subsection 6802(g)(2) only applies to lands managed by

the Bureau of Land Management, the Forest Service, or the Bureau of Reclamation; it

does not include the NPS.   Contrary to plaintiffs' position, the FLREA explicitly permits

the NPS to charge "an expanded amenity recreation fee … when the Secretary of the

Interior determines that the visitor uses a specific or specialized facility, equipment, or

service." 16 U.S.C. § 6802(g)(1).[8]   Based on the clear language of the statute, the Court

concludes that the FLREA specifically grants the NPS permission to charge an expanded

---

[7]Subsection 6802(g)(2) permits the Secretary to charge an expanded amenity recreation fee at lands managed by the Forest Service, the Bureau of Land Management, or the Bureau of Reclamation for the use of developed campgrounds that provide a majority of the following: tent or trailer spaces; picnic tables; drinking water; access roads; collection of the fee by an employee or agent of the federal agency; reasonable visitor protection; refuse containers; toilet facilities; or simple devices for containing a campfire.  16 U.S.C. § 6802(g)(2)(A).

[8]As noted by defendants, the opening clause of § 6802(g)(1) – "[e]xcept as limited by subsection (d)" – is not superfluous.  Some of the subparts of subsection 6802(d) do apply to NPS-managed lands, such as the prohibition on entrance fees at GRSM in § 6802(d)(3)(E).  However, not all of the subparts of § 6802(d), including § 6802(d)(1)(E), apply to NPS lands.

amenity recreation fee, or the BCF, when it is determined that the visitor uses a specific service. *See Broadcast Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 769 (6th Cir.), *cert. denied*, 546 U.S. 871 (2005) ("If the language of the statute is clear, a court must give effect to this plain meaning").

B.      36 C.F.R. § 71.9

Plaintiffs also contend via their briefs that the BCF is prohibited by 36 C.F.R. § 71.9, note 1, as further evidence that the BCF is contrary to law [Doc. 48 at pp. 21—22]. Defendants take the position that 36 C.F.R. § 71.9 has been superseded and is no longer current law [Doc. 72 at pp. 29—32]. Defendants contend that the Land and Water Conservation Fund Act of 1965 ("LWCFA"), 16 U.S.C. §§ 4601-6a, under which 36 C.F.R. § 71.9 was promulgated, was repealed by the FLREA and thus the regulation was abrogated. Defendants further argue that the regulation has been superseded as provided in 16 U.S.C. § 6812(f)[9] because it is not consistent with the provisions of the FLREA. Finally, defendants contend that, in any event, footnote 1 is not applicable because it refers to campsites within a campground and not to backcountry camping.

Plaintiffs, in response, insist that 36 C.F.R. § 71.9 is still "on the books" because it can still be located on a government website [Doc. 76 at pp. 2—5]. This is hardly persuasive authority that a regulation is or is not current law.

---

[9]16 U.S.C. § 6812(f) states that "[a] regulation or policy issued under a provision of law repealed by this section shall remain in effect to the extent such a regulation or policy is consistent with the provisions of this chapter until the Secretary issues a regulation, guideline, or policy under this chapter that supersedes the earlier regulation.'

The regulation at issue, 36 C.F.R. § 71.9(c), Establishment of recreation use fees, states as follows:

> (c)  Types of recreation facilities for which use fees may be charged:
> Tent, trailer and recreation vehicle sites [FN1]
> [1]Provided, that in no event shall there be a charge for the use of any campsite and adjacent related facilities unless the campground in which the site is located has all of the following: Tent or trailer spaces, drinking water, access road, refuse containers, toilet facilities, personal collection of the fee by an employee or agent of the bureau operating the facility, reasonable visitor protection, and simple devices for containing a campfire (where campfires are permitted).

Plaintiffs argue that because backcountry campsites do not have drinking water, an access road, refuse containers, toilet facilities, or reasonable visitor protection as set forth in footnote 1, the NPS cannot charge a fee for backcountry camping.

The Court need not resolve the question of whether this regulation has been abrogated by the adoption of the FLREA because the plain language of the regulation, read in its entirety, does not apply to backcountry camping.  The regulation prohibits a charge for use "of any campsite … unless *the campground in which the site is located* has all of the following… ." 36 C.F.R. § 71.9(c) (emphasis added).  This plainly applies to campsites within a campground, which are not subject to the BCF and are not at issue in this case.  Thus, this regulation does not prohibit the imposition of the BCF.

C.    Plaintiffs' Claims Under the Organic Act

Although it receives cursory attention in plaintiffs' briefs, the amended complaint asserts that defendants have violated the Organic Act through "deliberate and knowing misrepresentations and false pronouncements" about the BCF which violated their "fiduciary positions and legal obligations to protect, manage and administer the Smoky

Mountains in such a manner and in light of the high public value and integrity of the National Park System and to exercise those obligations in derogation of the values and purposes for which the Smoky Mountains was established" [Doc. 24, Count I at ¶¶ 88—89].  Plaintiffs further allege that the BCF "does not do any more to conserve the scenery and the natural and historic objects and the wild life therein and provide for the enjoyment of same … [and] results in an impairment of the enjoyment of the Smoky Mountains" in violation of the Organic Act [Doc. 24, Count V at ¶ 107].  Plaintiffs' brief suggests that a purported 25% drop in backcountry camping[10] since the implementation of the BCF is evidence that the fee has impaired the use of the Park in violation of 16 U.S.C. § 1,[11] "especially when there is no evidence in this Administrative Record that limiting backcountry camping could somehow preserve or 'conserve' the Smoky Mountains" [Doc. 48 at p. 23].

Defendants argue that plaintiffs have "misconstrued" the use of the term "unimpaired" in a way not supported by the plain meaning of the statute [Doc. 72 at p. 28].  The term "unimpaired" does not, defendants suggest, mean that visitors have the right to unrestricted use of the national parks free of charge.  Rather, defendants contend that "unimpaired" reflects congressional intent that the cultural and natural resources, such as scenery, natural and historic objects, and wild life, are to be preserved in an unimpaired condition [*Id.*].  Defendants further contend that the FLREA is proof that Congress intended to allow and authorize fees to be charged by the NPS for entrance into

---

[10]Plaintiffs do not indicate where this statistic came from or on what information it is based.
[11]16 U.S.C. § 1 is now codified at 54 U.S.C.A. § 100101.

the national parks and for use by visitors of various benefits and services within the national parks [*Id.*].

Defendants correctly note that plaintiffs cite no authority for their claims under the Organic Act, although the defendants' brief is also devoid of any authority interpreting this provision of the Organic Act. Plaintiffs simply allege that the "use of misinformation to corral support for this fee violates" the obligation to administer the Park "in light of the high public value and integrity of the National Park System" [Doc. 48 at p. 23]. Plaintiffs further claim that defendants violated the Organic Act "by not being forthright and honest in representations about the need for the BCF and about the benefits from the BCF" [Doc. 76 at p. 18].

The Organic Act, as recently amended, describes the purpose of the national park system "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a); *accord* 16 U.S.C. § 1. The statute further "reaffirms" that "[t]he authorization of activities shall be construed and the protection, management, and administration of the [national park system] shall be conducted in light of the high public value and integrity" of the NPS. 54 U.S.C. § 100101(b)(2); *accord* 16 U.S.C. § 1a-1.

Neither the new statute nor the Organic Act define the word "unimpaired" or the phrase "unimpaired for the enjoyment of future generations." However, this language has been interpreted as granting the NPS broad discretion in determining the methods to

29

best achieve the Organic Act's mandate. *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1454 (9th Cir. 1996) (quoting *Nat'l Wildlife Fed'n v. Nat'l Park Serv.*, 669 F. Supp. 384, 390 (D. Wyo. 1987)); *Organized Fishermen of Fla. v. Hodel*, 775 F.2d 1544, 1550 (11th Cir. 1985), *cert. denied*, 476 U.S. 1169 (1986) (the Organic Act gives NPS broad discretion in "weighing the competing uses" in the management of national parks); *Schieler v. United States*, 642 F. Supp. 1310, 1312 (E.D. Cal. 1986) ("[t]his section gives very broad discretionary power to the agency to promote and regulate the parks in such a manner that the scenery and natural and wild life in the parks are preserved unimpaired so that they may be enjoyed presently and in the future"). In other words, further defining and applying the "unimpaired" standard is within the NPS's delegation of authority. *S. Utah Wilderness Alliance v. Nat'l Park Serv.*, 387 F. Supp. 2d 1178, 1189—90 (D. Utah 2005). Nor is there any authority interpreting or clarifying the "high public value and integrity" with which the NPS is expected to operate.

More importantly, there is no provision in the Organic Act for judicial review or a private right of action. *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1286 (5th Cir. 1997). Thus, it appears that the Court can only evaluate the defendants' compliance with the Organic Act's "unimpaired" and "integrity" standards through the prism of the arbitrary and capricious review under the APA.

> D.    Whether the Decision to Implement the BCF was Arbitrary or Capricious

In Counts VII, VIII, and IX, plaintiffs claim that the decision to implement the BCF was arbitrary and capricious [Doc. 24 ¶¶ 111—124]. Plaintiffs argue that the defendants failed to comply with the requirements for public participation and civic

engagement before implementing the BCF and that the defendants provided the public with incorrect information about the BCF [Doc. 48 at pp. 22—26]. Plaintiffs argue that this use of misinformation "to corral support" for the BCF violates the defendants obligations to administer the Park "in light of the high public value and integrity of the National Park System" [*Id*. at p. 23, quoting 16 U.S.C. § 1a-1]. Plaintiffs also contend that the reasons given for the BCF were not supported by substantial evidence in the record.

Defendants begin their response by pointing to the criteria for recreation fees set forth in the FLREA [Doc. 72 at pp. 34—35]. The FLREA requires that recreation fees be consistent with the following criteria:

> (1) The amount of the recreation fee shall be commensurate with the benefits and services provided to the visitor.
> (2) The Secretary shall consider the aggregate effect of recreation fees on recreation users and recreation service providers.
> (3) The Secretary shall consider comparable fees charged elsewhere and by other public agencies and by nearby private sector operators.
> (4) The Secretary shall consider the public policy or management objectives served by the recreation fee.
> (5) The Secretary shall obtain input from the appropriate Recreation Resource Advisory Committee, as provided in section 6803(d) of this title.
> (6) The Secretary shall consider such other factors or criteria as determined appropriate by the Secretary.

16 U.S.C. § 6802(b). Defendants contend that only subsections (1), (3), and (4) apply to the BCF; subsection (2) does not apply because there were no aggregate fees to consider and subsection (5) does not apply to the NPS. Plaintiffs do not appear to dispute this point, nor do they articulate how the defendants have failed to meet these specific criteria. Thus, by the language of the FLREA, defendants were required to consider whether the

31

BCF was commensurate with the benefits and services provided, comparable fees charged elsewhere, and the public policy or management objectives served by the BCF.

1. <u>Whether the BCF is Commensurate with the Benefits and Services Provided</u>

As set forth in the final BCF implementation plan [AR 237—244], the proposed BCF "was determined to recover the direct costs for providing a reservation system with both internet and phone-in reservation capability, increased public access to trip planning assistance and permit compliance monitoring" [AR 240]. Thus, a plain reading of the BCF implementation plan outlines the benefits and services provided to the visitor, *i.e.*, a new online reservation system, increased trip planning assistance, and backcountry rangers for permit compliance monitoring. Further, the BCF implementation plan states "$4 per person per night is the fee rate and structure most preferred for GRSM. This rate and structure provides for cost recovery and is more equitable for all users than a flat fee. …Based on GRSM user statistics, this fee structure benefits the majority of backcountry users, as the average length of stay is two days" [*Id.*]. As noted in the final proposal [AR 240], fee structures at other national parks with similar backcountry characteristics were studied during the deliberative process [AR 46, 59, 66, 131].[12] The alternative fee structures for GRSM presented during the civic engagement process included: $10 per-

_____

[12]It is worth noting that the $4 per-person, per-night BCF is the lowest fee of the comparable fees considered. For example, backcountry fees at Rocky Mountain and Yellowstone National Parks are $20; $25 at Grand Teton National Park; $5 + $5 per person at Yosemite National Park; $30 + $2.50-$7 at Glacier National Park; $5 per group + $2 per person per night at Olympic National Park; and $10 + $5 per person per night at Grand Canyon National Park [AR 240].

reservation + $5 per-person; $10 per-reservation + $2.25 per-person, per-night; or $4 per-person, per-night [AR 131].

Plaintiffs do not appear to argue that the fee is not commensurate with the benefits and services provided; rather, they seem to argue that they do not want or need the services. While the statute provides no mathematical formula or other interpretation for determining how much or what type of services are sufficient to be "commensurate" with the recreation fee, the Court finds that the NPS adequately considered the benefits to be provided by implementation of the fee as required by § 6802(b)(1) and that the NPS's determination that the benefits and services would be commensurate with the amount charged is not arbitrary or capricious. The Court further concludes that the amount charged, $4 per-person, per-night, does not unlawfully "impair" the public's enjoyment of the Park.

2.    <u>Whether the Fee Charged is Comparable to Fees Charged Elsewhere and By Other Public Agencies and Nearby Private Sector Operators</u>

As noted above, the NPS considered the rates charged at other national parks with similar backcountry characteristics and considered several different fee structures for the BCF [AR 240]. No private sector operators were considered because there are no privately run backcountry facilities near the Park. As defendants correctly note, the plaintiffs do not appear to make the argument that NPS did not adequately consider comparable fees charged elsewhere [Doc. 72 at p. 36] or that another fee structure would be more appropriate; instead they argue that the BCF should not or cannot be implemented. Based on the record, it appears to the Court that the NPS did adequately

33

consider comparable fees charged at other national parks as required by § 6802(b)(3), as well as the preference expressed in the public comments. The decision to adopt the $4 per-person, per-night BCF was neither arbitrary, capricious, nor an unlawful "impairment" of the public's enjoyment of the Park.

   3.   Whether NPS Considered the Public Policy or Management Objectives Served by the BCF

As to the criteria in § 6802(b)(4), defendants cite to NPS Management Policies 2006, http://www.nps.gov/policy/mp/policies.html, as evidence that the NPS manages a broad range of recreational activities for national park visitors, including backcountry use [Doc. 72 at p. 37]. NPS uses the term "backcountry" to "refer to primitive, undeveloped portions of parks." *Id*. § 8.2.2.4. The Management Policies and the FLREA allow the NPS to charge an expanded amenity recreation (use) fee to support services such as protection, resource management, information and orientation, and maintenance of park facilities. *Id*. § 8.2.6; 16 U.S.C. § 6807(a)(3). NPS also emphasizes the FLREA provision allowing expanded amenity recreation fees "when the Secretary of the Interior determines that the visitor uses a … service." 16 U.S.C. § 6802(g)(1). Thus, defendants contend that the NPS determined there was a need to restructure the backcountry reservation and permitting processes, to improve trip planning services for backcountry visitors, and to afford a greater law enforcement presence in the backcountry [Doc. 72 at p. 37]. As noted above, the plaintiffs do not directly respond to this argument.

The record reflects that Park personnel were notified in May 2010 by the software developer for the Wilderness Trakker reservation system that the software was "a bit long

in the tooth" and could no longer be supported or updated [AR 15]. Thus, the need to replace the Trakker reservation system for backcountry reservations was the impetus for the process that led to implementation of the BCF, but other concerns were also raised in the early discussions among Park staff. For example, Park staff hoped to implement an online reservation and permit system to allow visitors to make reservations more quickly and easily; to have an NPS staffed backcountry office to provide educational information to visitors, handle calls for reservations, and provide trip planning assistance; to provide NPS staff for backcountry trip planning and reservation assistance at the Cades Cove Ranger station and the Oconoluftee Visitors Center; and to provide visitor information regarding backcountry use and safety [AR 23—25]. The possibility of "more commissioned rangers in the backcountry" for "enforcement" purposes was also raised in the initial discussions of backcountry planning [AR 25]. All of these concerns easily fall under the umbrella of "backcountry management," or "resource management" to use the terms of the FLRA, and the consideration of visitor services. The initial discussions also included potential sources of funding, primarily permit and/or reservation fees, to support these objectives [AR 25].

The Park requested and received approval to proceed with civic engagement activities to explore putting the backcountry campsites and shelters on NRRS and adopting a permit reservation fee to cover the cost of using NRRS [AR 28, 31—36, 48]. The final version of the Park's Backcountry Office & Permit Restructuring Proposal of July 27, 2011, which was released to the public, described concerns related to the backcountry reservation system, the need for more rangers in the backcountry and for trip

35

planning services, and the need for a reliable system of notification for safety reasons [AR 130—131]. Again, these concerns reflect consideration of "backcountry management" issues and visitor services.

Following the civic engagement process, the BCF implementation plan set forth that the proposed BCF "was determined to recover the direct costs for providing a reservation system with both internet and phone-in reservation capability, increased public access to trip planning assistance and permit compliance monitoring" [AR 240]. The proposed implementation plan also contained a summary of the Park's civic engagement process and noted that, of the general public's response, "more expressed specific concerns than support for the proposal" [AR 243]. The plan also noted the Park's concern for backcountry users who travel from outside the area as these visitors were "less likely to have learned of the proposal" and "would be expected to be the major benefactors of the improved backcountry trip planning services" [*Id.*]. The Park management concluded "that the benefits from the services proposed outweigh the concerns expressed over imposing a new fee" [AR 244].

The record also reveals internal discussions among various levels of NPS on the issue of whether the BCF was legally permissible or if the Park was "deed restricted" from charging such a fee. It appears that this belief, that the deeds to the Park land prohibited the charging of any fees, was a frequent comment in opposition to the BCF proposal [*see, e.g.*, AR 277, 300, 457-58, 472, 513, 572]. The issue was discussed and addressed among the various levels of NPS review as the Park sought approval to implement the BCF. In fact, the NPS reviewed an 1996 opinion from the Tennessee

Attorney General which concluded that the Park could not charge entrance fees, but was not restricted in charging user fees [AR 205—214, 217—227]. It also appears that the various levels of NPS approval had concerns and discussions "about the number of negative comments received" during the public engagement process [AR 230, 232—236, 245—46]. Thus, throughout this process, it appears that NPS did consider the public policy and management objectives to be served by the BCF as required by § 6802(b)(4) and that the input received during the deliberative process impacted the final proposal. The Court concludes that NPS did satisfy the required criteria of the FLREA in 16 U.S.C. § 6802(b) in establishing the BCF and the decision to implement the BCF was not arbitrary, capricious, or an unlawful impairment of the public's access to the Park.

4. Whether Defendants Satisfied the Requirements of Public Participation and Civic Engagement

Plaintiffs contend that defendants did not comply with the requirements for public participation and civic engagement before implementing the BCF [Doc. 76 at pp. 5—11]. Indeed, this seems to be the argument on which the plaintiffs primarily rely and emphasize: that the defendants did not do all they were required to or should have done to include public participation and civic engagement in the process of considering the BCF. Further, plaintiffs argue that the BCF should not have been approved because the public response was largely opposed to implementing the BCF. Plaintiffs weave several sub-issues under the umbrella of this argument, including their claims regarding the NPS's alleged failure to administer the Park with "integrity."

37

In addition to satisfying the § 6802(b) criteria discussed *supra*, the FLREA requires that the public be given "opportunities to participate in the development of or charging of a recreation fee" and that the Secretary "publish notices of a new recreation fee … in local newspapers an publications located near the site at which the recreation fee would be established or changed." 16 U.S.C. § 6803(a)-(b). The required process for public engagement is set forth in NPS's Public Participation and Notification Guidelines, Appendix L, as follows:

1. Engage the public about any proposed changes. …
2. Once the results of civic engagement show support for the change submit a request for approval through the Regional Director (RD) to WASO.
3. After rates are approved at all levels (RD, WASO), notify the public and commercial tour operators of the new or changed fees.
4. Notify the public on how fee revenues are used at the site.
5. Report annually to the RD on how the park has informed the public about the use of fee revenues.

[AR 50—54]. During the public participation process (step 1), a park Superintendent must notify and obtain input from Congressional delegations, federal, state and county officials, local chambers of commerce, and commercial tour operators [AR 52]. Additionally, the park must engage in a minimum of one of the following activities: public meeting/open house; focus groups; soliciting input about proposed changes through local media; surveys/comment cards; radio "call-in" programs soliciting public opinion; gatherings; interpretive walks; or soliciting opinions via the internet [*Id.*]. Appendix L further advises that "[m]ethods for engaging the public are not 'one size fits all'" [*Id.*]. Thus, the park "Superintendent may choose from a variety options to solicit public opinion and test how the changes will be received" [*Id.*].

38

a.      Timing of Civic Engagement

As noted in defendants' reply brief [Doc. 84 at p. 8], plaintiffs argue that the defendants failed to conduct civic engagement *before* creating the BCF [*see* Doc. 76 at p. 5]. Plaintiffs do not further explain this argument and it is without support in the record. It is plain that the defendants developed a plan to improve the reservation and permitting system for backcountry camping that included implementing a new fee, that they requested and received permission to conduct civic engagement on the proposal, that they did in fact conduct civic engagement, that the results of their civic engagement were incorporated into the final BCF proposal, and that the BCF was implemented only after the final proposal was approved through the various levels of the NPS.

b.      Notice of the Proposed BCF

Relying on 16 U.S.C. § 6803, plaintiffs contend that the defendants were required to publish advance notice of the BCF and their guidelines for public involvement in the Federal Register and did not do so [Doc. 76 at p. 7]. However, as defendants point out in their reply [Doc. 84 at p. 8—9], the provisions for notice in the Federal Register in § 6803 are inapplicable to the instant case because the BCF is a "new recreation fee," but not a "new recreation fee *area*." *See* 16 U.S.C. § 6803(b) ("The Secretary shall publish a notice in the Federal Register of the establishment of a *new recreation fee area* for each agency 6 months before establishment"), § 6803(c) ("Before establishing any *new recreation fee area*, the Secretary shall provide opportunity for public involvement by … (3) publishing the guidelines in paragraphs (1) and (2) in the Federal Register") (emphases added). As explained in Appendix L, a new fee area is established when a

39

park that has never charged an entrance fee or an expanded amenity fee decides to begin charging a fee for the first time [AR 51]. It is undisputed that GRSM charged other expanded amenity fees, primarily for the use of campgrounds and picnic pavilions, before the BCF was considered or implemented [AR 178]. Thus, the implementation of the BCF did not make GRSM a "new recreation fee area," rather, the BCF was a "new recreation fee."[13] Pursuant to the plain language of the statute, the requirements for publication in the Federal Register only apply to "new recreation fee areas" and the NPS was not required to provide advance notice of the BCF in the Federal Register. The defendants' failure to do what was not required by the statute cannot be considered arbitrary or capricious.

In this case, the FLREA required the Secretary to "publish notice of a new recreation fee … in local newspapers and publications located near the site at which the recreation fee would be established or changed." 16 U.S.C. § 6803(b). The statute contains no definition of what it means to "publish" notice of a new recreation fee, the parties have not supplied any definition, nor has the Court found any interpretation of this term. The record reflects that GRSM personnel prepared and issued at least two press releases on the BCF proposal on July 29, 2011, and August 8, 2011 [AR 132—134]. Further, although the articles themselves are not contained in the AR, many of the public comments reference various newspaper articles on the BCF proposal [*see e.g.*, AR 324, 326, 329, 334, 343, 367]. Thus, it is fair to conclude that notice of the BCF was

---

[13]As explained in Appendix L, a park that currently charges an entrance fee or an expanded amenity fee and adds a new fee to their current fees is adding a new fee [AR 51].

published in area newspapers prior to its implementation and that some members of the public learned of the proposal through these news reports. The Court finds that this method of "publication" is close enough to satisfy the intent of the statute and is not arbitrary or capricious, nor does it indicate a lack of integrity by the NPS.

  c.  Compliance with NPS Guidance

  Plaintiffs cite to a 2007 NPS Director's Order #75A, regarding Civic Engagement and Public Involvement, as additional evidence that defendants did not satisfy the FLREA's civic engagement requirement [Doc. 76, Ex. 2]. This document describes its purpose as to "articulate our commitment to civic engagement" and that "[t]his philosophy means that we do more than meet the minimum legal requirements for public involvement in our decisions and activities" [*Id*. at pp. 1, 2]. Plaintiffs seem to suggest this means defendants are required to "do more" than what is required by the FLREA for proper civic engagement [Doc. 76 at p. 7].

  Plaintiffs, however, are relying on a philosophical and aspirational statement. It does not contain binding or legally enforceable requirements. In fact, Director's Order #75A specifies that it "is intended only to improve the internal management of the NPS and it is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity" [Doc. 76, Ex. 2 at p. 4]. *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071—73 (9th Cir. 2010) (NPS management policies do not "establish rights in the public generally"); *Greater Yellowstone Coalition v. Kempthorne*, 577 F. Supp. 2d 183, 206 (D.C. Cir. 2008) (NPS management policies "are not independently judicially enforceable"); *Wilderness Society v. Norton*, 434 F.3d

41

584, 595—97 (D.C. Cir. 2006) (NPS management policies are only for internal guidance and do not establish binding rules). More importantly, plaintiffs do not specify, nor is it apparent from review, how the defendants failed to meet these aspirational goals in an arbitrary or capricious way.

           d.     Misinformation

Plaintiffs also argue that defendants provided the public with misinformation about the BCF and that this precluded appropriate public participation [Doc. 48 at pp. 22—24]. This argument also seems to support plaintiff's claim that the defendants have failed to manage the Park with "integrity" as required by the Organic Act [Doc. 76 at pp. 18—20]. Among the allegedly incorrect information plaintiffs contend that defendants described: campsites as "overrun, crowded and trashed;" that the defendants received "consistent" complaints about the permit reservation system; that the BCF would fund one, then two, rangers to patrol the backcountry; that the only county opposing the BCF was Swain County, North Carolina; that defendants had contacted the Blount County Commission with a detailed briefing of the BCF proposal; that plaintiffs "employed misinformation" to fight the BCF; and that issues of concern could be satisfactorily addressed in the design of the new reservation system [*Id.* at pp. 22—23]. Much of this alleged misinformation comes from the various drafts of the BCF proposal, which are described as having been "word-smithed," before it was released to the public [Doc. 48 at pp. 5—10; Doc. 76 at pp. 18—20]. Defendants respond that it is plaintiffs who have mischaracterized the defendants' communications on the BCF [Doc. 72 at pp. 45—46,

49—54].  Defendants further argue that the "reasons for" and "contours of" the BCF proposal "developed over time" as most programs do [Doc. 84 at p. 28].

First, it is completely unsurprising that details of a new recreation fee proposal would evolve over time and that early non-public drafts of the proposal would differ from the final version released for public input.  Plaintiffs correctly note that the initial request to conduct civic engagement stated, "[t]here will be no increase in overall annual revenue as the result of this proposed increase as this will simply be a new fee to cover the recreation.gov service fees" [AR 34].  It is also undisputed that the benefits of the proposed BCF plan evolved from merely funding a new reservation system, to include trip planning services and backcountry enforcement.  Plaintiffs cite to the initial proposal for civic engagement for the proposition that defendants were "only authorized to charge a fee to pay for the reservation system" [Doc. 48 at p. 26].  This is incorrect.  As defendants point out, this initial proposal was only a request to begin the civic engagement process.  It was not the final fee proposal or the final plan authorized by WASO.  The evolution of this plan, all during the proposal stage, does not show that defendants misled the public or that they acted arbitrarily or capriciously.

Further, it appears upon examination that some of plaintiffs' complaints are simply disputes as to the characterization of the evidence, rather than genuine disputes of material fact.  It is undisputed that the defendants received complaints about the prior reservation system, whether those complaints should be described as "consistent" or not. Some of those complaints are in the administrative record and some are referenced anecdotally by Park employees and the public comments.  It is also undisputed that the

43

need for more Park rangers in the backcountry was discussed as part of an "ideal" system from the initial planning meeting [AR 25] and that this aspect of the BCF proposal evolved over time. It is undisputed that the only feedback from a neighboring county on the BCF during the civic engagement process was from Swain County, North Carolina. The opposition from Blount and Knox Counties, as discussed in more detail *infra*, did not occur until *after* the BCF was approved and announced for implementation. While Park employees did accurately summarize the misperceptions expressed in the public comments [AR 149], that summary does not equal accusing the plaintiffs themselves of employing misinformation. Whether or not issues of public concern can be satisfactorily addressed in the design of the new reservation system remains to be seen; it is clear that that is defendants' goal for the program as expressed in the final proposal [AR 244] and in Superintendent Ditmanson's public statement [AR 259]. In short, plaintiffs' allegations of misrepresentation are largely unfounded. These disputes about the characterization of the evidence do not persuade the Court that the defendants misinformed or misled the public such that defendants did not satisfactorily conduct civic engagement. The Court further concludes that these allegations do not indicate that the defendants have failed to manage the Park with the "integrity" required by the Organic Act.

> e.     Input from federal, state, and local officials

Next, plaintiffs argue that defendants did not "notify and obtain input from" local Congressional delegations, state and local officials, and local chambers of commerce as required by Appendix L [AR 52; Doc. 48 at pp. 11—12; Doc. 76 at p. 6]. Plaintiffs

44

contend that defendants did not contact local Congressional delegations, state and local government officials, or any chambers of commerce [*Id.*]. In support of this argument, plaintiffs rely in part on resolutions passed by Swain County, North Carolina, Blount County, Tennessee, Knox County, Tennessee, and a proclamation from the Tennessee House of Representatives, all in opposition to the BCF [Doc. 45, Exs. 2—5]. It is noteworthy that all of these resolutions contain similar language, *e.g.*, opposing "the imposition of any backcountry camping fees in the Great Smoky Mountains National Park that are not directly associated with the use of amenities or a commercial purpose" [Doc. 45, Ex. 5]. It is more noteworthy that all of these resolutions were passed in February – April 2013, over one year *after* the civic engagement process concluded and the BCF was approved for implementation. Thus, these proclamations do not represent contemporaneous input from state and county officials on the proposed BCF.

The Court is instructed by the APA to "ensure that an agency satisfied legal requirements in taking an action and that the action was not arbitrary and capricious *at the time it was taken*." *Davidson v. U.S. Dep't of Energy*, 838 F.2d 850, 854 (6th Cir.), *cert. denied*, 487 U.S. 1207 (1988) (emphasis in original). Because these proclamations did not exist at the time the BCF was under consideration, they naturally were not considered by the NPS as part of its deliberative process. While the resolutions may express the after-the-fact collective disagreement of those representative bodies with the NPS's decision to adopt the BCF, they do not demonstrate that the decision was arbitrary or capricious at the time it was made. Nor do they demonstrate that the NPS failed to "notify and obtain input from" those state and local officials.

45

The administrative record contains a list of "public scoping contacts" for the civic engagement process that includes Congressional delegations from North Carolina and Tennessee, other federal, state, and local officials, twelve area chambers of commerce, commercial use authorization holders whose services include overnight backcountry camping, and various other Park partners and interested groups [AR 56—57]. The record also contains evidence that, prior to the public release of the BCF proposal, GRSM personnel discussed who would contact the various partner organizations and interested groups [AR 128]. Specifically, the record indicates that Park Superintendent Ditmanson would be contacting the Congressional delegations [*Id.*]. Further, the summary of the civic engagement process contained in the BCF implementation plan, submitted November 8, 2011, contains the following relevant passages:

> During the weeks of July 25th and August 1st a detailed briefing of the fee proposal, including instructions for submitting comments, was widely distributed to all potentially interested park partners and other NGO's, CUA holders, local Congressional delegations, and state and local elected representatives and government officials. … Phone calls were made to the delegations, CUA holders, partners and local officials. …

> **Feedback of Congressional Delegation and Nearby Federal, State, and County Officials:** No written comments were received, though verbal comments were generally positive with the exception of the Swain County, NC commissioners (one of the seven counties neighboring the park) who were against any backcountry camping fees in principle.

> **Feedback of Stakeholder Organizations:** No written comments were received from local Chambers of Commerce … . Verbal comments, however, from these stakeholders were generally positive.

[AR 167]. Additionally, an email from Park Superintendent Ditmanson to the SER office during the approval process states:

I personally briefed the staff of all our congressional delegation. …There were no concerns expressed by any of the offices with our proceeding with the back country fee proposal. … I have continued to check in with the congressional delegation staff on numerous occasions. I met with staff of Senator Corker (TN) and Representative Duncan (TN-2) last week to learn if they are receiving constituent calls or correspondence regarding this issue, and both offices indicated they are not. Following our call yesterday I spoke with staff in the offices of Senator Alexander (TN), Senator Burr (NC), Senator Hagan (NC), Representative Shuler (NC-11) and Representative Roe (TN-1). Some offices have not received a single inquiry regarding the proposal while others had a few calls. Please note add [*sic*] that we have not received a single controlled correspondence request from any of the congressional offices regarding the fee proposal.

[AR 257]. Although there are no written notes or other documentation of these contacts, the presumption of regularity afforded to agencies leads the Court to conclude that defendants did what they claim to have done. *Wayne State Univ. v. Cleland*, 590 F.2d 627, 632 (6th Cir. 1978) (citing *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 415—16). Thus, the record reflects that, contrary to plaintiffs' assertions, the defendants did contact local Congressional delegations, other federal, state, and local officials, and local chambers of commerce as required by Appendix L.[14]

Plaintiffs rely on the affidavit of Ted A. Burkhalter, Jr., a member of the Blount County Commission, who states that he was never contacted by anyone from defendants' organizations concerning the proposed BCF prior to its implementation [Doc. 45, Ex. 3 at ¶ 2]. Mr. Burkhalter also believes that no other members of the Blount County

[14]Much like their argument as to the lack of documentation of "verbal complaints" received, plaintiffs imply that all information received by an agency during the decision-making process must be committed to writing and included in the administrative record [*See* Doc. 76 at p. 16 ("[w]ithout substantiation, the record does not reflect reasoned decisionmaking")]. However, plaintiffs have provided no authority for such a stringent interpretation of the APA, nor has the Court found one. The agency must include all relevant information that existed at the time in the administrative record, but there is no requirement that every conversation or experience must be documented for it to be considered by the agency.

Commission were contacted about the BCF prior to its implementation [*Id.*]. Mr. Burkhalter further states that, in a February 2013 conversation, Park Superintendent Ditmanson admitted that he "did not directly contact" the Blount County Commission regarding the proposed BCF [*Id.* at ¶ 3]. Even if true, this testimony does not create a disputed issue of material fact. Mr. Burkhalter's testimony does not exclude the possibility that some Commission members were contacted by Park personnel other than Mr. Ditmanson. The evidence in the record shows that NPS personnel intended to contact local government officials and that they actually did so. The presumption of regularity accorded to agencies in their affairs allows the Court to presume that NPS did what they claim to have done. *Wayne State Univ.*, 590 F.2d at 632. The record also reflects that the Park did not receive any contemporaneous written feedback with the exception of two commissioners from Swain County, North Carolina, as noted above [AR 271, 644]. The subsequently written resolutions and proclamation do not prove otherwise and do not create a disputed issue of material fact.

Plaintiffs also assert that there was negative feedback regarding the BCF proposal from a Member of Congress [Doc. 76 at p. 11]. However, their citations to the administrative record only reveal that three written comments from members of the public indicate that those comments in opposition to the BCF were also conveyed to Congressman John J. Duncan, Jr. [*see* AR 513, 550, 651]. The only written communication the Park received from any Member of Congress was an inquiry from Congressman David P. Roe in which he asked to be provided information with which to respond to a constituent letter on the BCF proposal [AR 156]. This does not equate to

48

negative feedback from Congress or evidence that the decision to implement the BCF was arbitrary, capricious or made without integrity.

f.     Public support for the BCF

Finally, plaintiffs emphasize that the public participation guidelines required that defendants proceed with implementing the BCF only after the civic engagement demonstrated public support [Doc. 76 at pp.7—9].  As noted above, the second step in the public participation guidelines, Appendix L, directs the superintendent submit a request for approval of a new fee "[o]nce the results of civic engagement show support for the change" [AR 51].  The guidelines contain no definition of "support" or otherwise describe how much support is required.  Defendants point out that the guidelines also state that "[i]nput from the public should be considered when the request for approval is submitted.  The park may decide to submit the rate as planned or alter it due to public input" [AR 52].  Thus, defendants argue that they were not required to show "majority" support for the proposal and that the superintendent has discretion to proceed with the fee proposal despite public opposition [Doc. 84 at p. 13].

Plaintiffs further argue that defendants misled WASO during the review process by stating that the civic engagement process showed support for the BCF when it did not [Doc. 76 at p. 19].  However, as defendants point out and as contained in the administrative record, the NPS personnel who reviewed the BCF proposal at SER and at WASO were aware of the public opposition to the BCF.  The summary of civic engagement submitted with the final proposal noted that "the majority of respondents were opposed to any new fee" [AR 243].  Further, the email correspondence among NPS

49

personnel during the review period indicates awareness of and concern about the negative feedback: "we are getting questions about the number of negative comments received during the civic engagement processes" [AR 230]; GRSM "had some push back when they did their civic engagement" on the BCF [AR 232]; "[m]y concerns are more about the specific negative public feedback they received and how they plan to be responsive to it" [AR 233]; GRSM "received many negative public comments" about the BCF [AR 234]; GRSM "appear to be proceeding in spite of strong public opposition … All of this is pitting the local community against the Park Service, which can't be a good thing for either party" [AR 235]; "[t]he majority of written comments are negative but there is both negative and positive comments about the proposed fee. Most of the opposition is coming from the locals that use the park" [AR 245]. Thus, there is no evidence that WASO was misled as to the nature or amount of support for the BCF.

The record indeed reflects that much of the public response to the BCF proposal was negative or at least mixed. As the summary of the civic engagement process states, "a total of 230 written comments and two petitions were received from the general public. Of the responders, more expressed specific concerns than support for the proposal" [AR 243]. The NPS surmised that most of the respondents were "local, frequent overnight users, who are well familiar with the park's backcountry" [*Id.*]. The NPS further surmised that a "less represented stakeholder group appears to be the less-frequent backcountry users who travel from outside the area … [and] are less likely to have learned of the proposal," but "would be expected to be the major benefactors of improved backcountry trip planning services" [*Id.*].

50

The Park summarized the comments received as follows:

- **General principle of charging a fee for overnight backcountry users:** Though a number of respondents support the concept that such a fee is appropriate to be collected and used as proposed, the majority of respondents were opposed to any new fee. Some of the opposition seems to be philosophically based; some based on the perception that visiting the park was intended to be "free" by its founders; some based on the objection that overnight backcountry users would have to pay a fee while many other park users would not; some based on the opinion that the Park should be able to absorb the increased costs with existing funding allocations; and some based on the perception that some users cannot afford the fee.

- **Fee rate and structure:** General concern was expressed about keeping any fees reasonable. The greatest support was shown for a fee of $4 per person, per night fee structure, one of many options forwarded to the public for consideration. This rate and structure was perceived as having the least financial impact to the average GRSM backcountry permit holder and seemed to many responders to be the most equitable (i.e. cost directly equates to extent of use). Many respondents, though, felt that stock users should pay more, while others were in support of a frequent user pass.

- **Reservation system:** Some respondents thought an expanded reservation system was appropriate and that Recreation.gov or another online system would be a worthwhile improvement. Other respondents objected to the use of Recreation.gov due to their perception that it is cumbersome to use or that the revenues should be used to employ local call handlers familiar with the resource. Other opponents disagreed with the premise altogether that overcrowding of campsites occur and that any reservation system is necessary at all.

- **Thru hikers:** Some respondents had a philosophical issue with incurring any fee along the Appalachian Trail, while others were concerned with the logistics of thru-hikers acquiring advanced reservations and permits. Some respondents offered constructive suggestions for handling the logistical challenges associated with thru-hikers.

- **Desired outcome if the proposal is implemented:** Some respondents expressed distrust that funds would be used as proposed, while others were supportive of the fee as long as used as indicated. Many agreed that more backcountry rangers and/or improved camping conditions are needed in the backcountry, though some expressed doubt that two rangers would make much of a difference.

51

[AR 243—44].  Notably, the summary concludes that "park management feels that the benefits from the services proposed outweigh the concerns expressed over imposing a new fee.  It appears that most issues of concern that go beyond the philosophical issue of imposing any fee can be satisfactorily addressed in the design of a reservation system and its subsequent implementation" [AR 244].

This, then, is the crux of the issue:  NPS released the BCF proposal to the public for input, received and reviewed that input, acknowledging that much of it was negative, and then decided to implement the BCF anyway by concluding that the benefits of the plan outweighed the concerns.  The plaintiffs and those opposed to the BCF are understandably disappointed in this decision and could easily assume that defendants did not truly consider the public comments.  After all, if so much of the public response was negative, how could the defendants have considered that input and still decided to proceed with the BCF?  Indeed, the passionate opposition to the BCF leads a reasonable mind to question whether another conclusion should have been reached, or why the Park management placed such emphasis on benefits for the "less represented stakeholder group" rather than benefits for the frequent, local Park visitors.  The legal question for this Court, however, is whether that decision was arbitrary or capricious.

The summary of public comments, as set forth above, fairly describes the issues raised, although with less vitriol than expressed in some of the comments.  Superintendent Ditmanson's press release upon approval of the BCF acknowledged some of the concerns raised about using the Recreation.gov reservation system.  Specifically, he stated, "[w]e will not use that system unless we are convinced that it can provide the

52

level of service we want to offer, and are exploring the alternative of developing a stand-alone software program tailored specifically to the Smokies. The system developed will also need to be practicable for Appalachian Trail thru hikers whose itineraries evolve from day-to-day" [AR 259]. Further, the defendants adopted the $4 per-person, per-night rate, the fee structure most favored by the public. All of this, as a fair reading of the record, suggests that the defendants did consider the public input and that some of the input influenced the details of the final plan.

Moreover, the record contains evidence of substantial support for the BCF from the public, including GRSM employees. The support is not overwhelming, or even a majority of the responses received. Nevertheless, there is evidence of more than minimal support for the BCF proposal and "support for the change" is all that the NPS public participation guidelines require [*see* AR 51]. Neither the plaintiffs nor the defendants have provided any authority to suggest how such "support" must be measured, nor has the Court found any. Accordingly, in the absence of any such guidance, the Court must reasonably interpret the guidelines as written and not "substitute its judgment for that of the agency." *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416. On this record and under the APA's narrow standard of review, the Court must conclude that the record does show "support" for the BCF plan. Plaintiffs' dispute of the characterization of the level of support does not mean that the facts themselves are in dispute.

In sum, there is no evidence that the NPS "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43)). After a careful review of the record and the NPS's reasons for proposing and implementing the BCF, the Court concludes that the decision was not arbitrary or capricious. *See Michael v. United States*, 36 Fed. App'x 821, 823 (6th Cir. 2002) ("[a]s long as the decision bears a rational relation to the facts in the matter, and the decision is sufficiently detailed that its reasons may be discerned, the decision must be upheld"). The Court further concludes that the decision to implement the BCF does not unlawfully impair the resources of the Park or administer the Park contrary to the high public value and integrity required by the Organic Act.

E.    Licensing Claims

Count II of the Amended Complaint concerns the defendants' alleged grant of a license to former Governor Sundquist by relocating a portion of the Ace Gap Trail from his property and the alleged grant of a license to Blackberry Farm which allows the exclusive use of Park trails by Blackberry Farm guests, all in violation of 16 U.S.C. § 3 [Doc. 24 at ¶¶ 91—92]. This provision of the Organic Act, as amended, states that "[n]o natural curiosity, wonder, or object of interest shall be leased or granted to anyone on such terms as to interfere with free access by the public to any System unit." 54 U.S.C.A. § 102101(a)(1) (2014); *accord* 16 U.S.C. § 3. It appears undisputed that NPS did relocate a portion of the Ace Gap Trail from Governor Sundquist's property in 2001 and that unauthorized trail signs and markers were placed inside the Park boundary by the

Blackberry Farms resort at least as early as 2007. The plaintiffs, however, cite virtually no legal authority for their position that these facts show that NPS granted a license to Governor Sundquist and/or to Blackberry Farm.

Plaintiffs' initial reply brief states that "defendants' pattern of consistent failure to follow the law in fulfilling their duties is the issue" with respect to these claims [Doc. 76 at p. 14]. This allegation does not state a valid claim for relief. *See Utah v. Babbitt*, 137 F.3d 1193, 1205 (10th Cir. 1998) ("the mere allegation that defendants are acting without authority or in violation of the law is insufficient to establish standing"). Plaintiffs also suggest, without factual support, that the Ace Gap Trail was Park property; thus, Governor Sundquist's only remedy was to file an action to quiet title pursuant to 28 U.S.C. § 2409a and defendants "moved the trail instead of complying with" the Quiet Title Act [Doc. 76 at p. 15]. There is no evidence in the record that this portion of the Ace Gap Trail was Park property or that it became Park property through some method of acquisition. The Quiet Title Act waives the United States' sovereign immunity in certain situations where it may be sued "as a party defendant … to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). There is no evidence of a title dispute between Governor Sundquist and the NPS over this segment of the Ace Gap Trail. Further, plaintiffs provide no explanation for how the defendants failed to comply with a process that must be initiated by the adverse party. With respect to the Blackberry Farm issue, plaintiffs state that "[d]efendants have been aware of the private resort illegal intrusions since 2007" and "nothing was done until this

55

lawsuit was filed" [Doc. 76 at p. 15]. This, too, does not state a claim and is contrary to the undisputed facts set forth in the affidavits of Park Rangers Looney and Eckert regarding relocation of trail signs and markers.

Defendants present several arguments in opposition to these claims, including that any claim related to the relocation of the Ace Gap Trail is time-barred. Defendants are correct. Civil actions brought against the United States "shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). It is well settled that the six-year statute of limitations in § 2401(a) applies to actions brought under the APA. *Friends of Tims Ford v. TVA*, 585 F.3d 955, 964 (6th Cir. 2009); *Sierra Club*, 120 F.3d at 631. Although plaintiffs allege that the trail was rerouted in 2004 [Doc. 24 at ¶ 67], the undisputed evidence submitted by defendants indicates that the Ace Gap Trail was rerouted in 2001 and this case was filed in March 2013. In any event, whether using the 2001 or the 2004 accrual date, the Ace Gap Trail claim was filed far beyond the six-year statute of limitations and is time-barred.

Defendants also correctly argue that plaintiffs have not challenged a "final agency action" or a "failure to act" and therefore there is no jurisdiction over these claims [Doc. 72 at pp. 62—65]. As noted *supra*, there is no provision in the Organic Act for judicial review or a private right of action. *Dunn-McCampbell Royalty Interest*, 112 F.3d at 1286. Thus, any judicial review of these claims can only be pursuant to the APA. In order to establish jurisdiction under the APA, plaintiffs must challenge either a "failure to act" under § 706(1) or a final agency action under § 706(2). 5 U.S.C. § 706. Plaintiffs

56

have done neither.  Further, it is clear that the NPS has broad discretion in managing Park resources, including the location of trails and signage within the park.  *See Nat'l Wildlife Fed'n*, 669 F. Supp. at 391 ("the Park Service has broad discretion in determining which avenues best achieve the Organic Act's mandate").  In the absence of any final agency action subject to judicial review under the APA, the Court has no jurisdiction over these alleged licensing claims and the defendants are entitled to summary judgment.

F.  <u>Count IV</u>

Count IV of the Amended Complaint seeks a declaratory judgment that backpackers "are not limited to backpacking in, on and around designated campsites and are free to backpack in areas beyond areas designated for collection of the backpacker tax" [Doc. 24 at ¶ 99].  This claim is asserted pursuant to 16 U.S.C. § 6802(d)(4), which provides that "[n]othing in this chapter shall limit the use of recreation opportunities only to areas designated for collection of recreation fees."  In other words, the plaintiffs ask the Court to declare that they "are not limited to designated campsites and are free to backpack in areas beyond those designated for collection of this fee" [Doc. 48 at p. 2]. The extent of plaintiffs' briefing on this claim is three sentences reiterating the allegation of the amended complaint [*see* Doc. 48 at pp. 2, 23].  Defendants' minimal briefing on this claim contends that it was "impliedly dismissed" by a prior ruling and that, in any event, backcountry visitors can camp beyond designated backcountry campsites as long as they obtain a permit and pay the BCF [*see* Doc. 72 at p. 4, n.3].

The lack of meaningful briefing on this issue arguably constitutes a waiver of this claim. *See McPherson v. Kelsey*, 125 F.3d 989, 995—96 (6th Cir. 1997), *cert. denied*, 523 U.S. 1050 (1998) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). The Court finds, more significantly, that plaintiffs fail to explain how this issue states a live case or controversy for resolution. The plaintiffs have alleged no injury suffered or a definite and concrete dispute between the parties, as opposed to merely seeking an advisory opinion as to what the law would be upon a hypothetical state of facts. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ("the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment"); *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (a federal court has no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it") (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). In the absence of a live case or controversy for determination, the Court does not have jurisdiction over this claim and it will be dismissed. *See Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir.), *cert. denied*, 522 U.S. 860 (1997) ("Article III of the Constitution confines the power of the federal courts to adjudication of 'cases' or 'controversies'").

## IV.    Conclusion

For the reasons set forth herein, the Court finds that defendants are entitled to judgment as a matter of law on all claims and their motion for summary judgment [Doc. 64] will be granted.  Further, plaintiff's motion to vacate [Doc. 44] will be denied.  An appropriate order will be entered.

<u>    s/ Thomas W. Phillips                            </u>
SENIOR UNITED STATES DISTRICT JUDGE